## Ella Dandurand, Appellee, v. The Hydrox Company et al., on appeal of The Hydrox Company, Appellant.

## Gen. No. 26,405.

1. MASTER AND SERVANT—*what may be alleged and proven in action based on violation of Occupational Diseases Act.* In a death case under the Occupational Diseases Act (Cahill's Ill. St. ch. 48, ¶ 185 *et seq.*), in which defendant claimed that although plaintiff charged a violation of section 1 of the act (Cahill's Ill. St. ch. 48, ¶ 185) which does not indicate the nature of the devices, means or methods which were to be adopted by the employer, she had undertaken to prove a violation of section 2 (Cahill's Ill. St. ch. 48, ¶ 186) which indicates some of the protective measures to be used, *held* that plaintiff was justified in asserting and proving the failure of defendant to observe the protective measures or use the devices mentioned in various sections of the act, under the theory that all such devices, etc., are fairly included within the category of "reasonable and approved devices, means or methods for the prevention of such industrial or occupational diseases," mentioned in such section 1.

2. PLEADING—*when defects and inaccuracies cured by verdict.* Defects and inaccuracies in alleging a violation of section 1 of the Occupational Diseases Act (Cahill's Ill. St. ch. 48, ¶ 185) and proving the specific methods enumerated in other sections, under the general category of "reasonable and approved devices, means or methods," etc., mentioned in said section 1, were cured by the verdict.

3. MASTER AND SERVANT—*when master's liability under Occupational Diseases Act and not under Workmen's Compensation Act.* The remedy against an employer for the death of a painter from lead poisoning is under the Occupational Diseases Act, and not under the Compensation Act, where it seemingly is admitted that the decedent died from lead poisoning.

4. MASTER AND SERVANT—*whether lead poisoning occupational disease as question for jury.* Whether or not lead poisoning is an occupational disease incidental to the work of a painter is a question for the jury.

5. APPEAL AND ERROR—*when one inducing error cannot assign it.* A defendant in a death case based upon the Occupational Diseases Act, who had objections sustained to plaintiff's attempts to prove numerous cases of lead poisoning arising in connection with work as a painter, ought not to be heard to object that such proof was

not made, as the making of the proof was prevented by his own objections.

6. MASTER AND SERVANT—*instructions in action based on violation of Occupational Diseases Act*. Instructions in a death case based upon the Occupational Diseases Act, embodying in their terms the provisions of the act, and stating that a failure to comply with its provisions would constitute a wilful violation of the act, and a wilful failure to comply with its provisions in the sense that the word "wilful" is used in the act, *held* not objectionable.

7. MASTER AND SERVANT—*sufficiency of evidence in action under Occupational Diseases Act*. Facts reviewed in an action for the death of a painter, who while painting coolers and other things was required to be around and come in contact with and be exposed to poisonous fumes, etc., based upon the violation of section 1 of the Occupational Diseases Act (Cahill's Ill. St. ch. 48, ¶ 185), requiring the employer to provide reasonable methods for the prevention of industrial or occupational diseases incident to the work or process, etc., and involving other sections of the act, and *held* that lead poisoning, from which decedent died, was incidental to the work of decedent under the circumstances, and that decedent died as the result of the disease while in defendant's employ because of the wilful violation of provisions of the act.

BARNES, J., *dubitante*.

(See dissent based on doubt whether decedent's employment was distinguishable from the ordinary work of a shop painter.)

Appeal from the Superior Court of Cook county; the Hon. JOSEPH H. FITCH, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1920. Affirmed. Opinion filed November 1, 1921. *Certiorari* denied by Supreme Court (making opinion final).

UNDERWOOD, SMYSER, YOUNG & BASSE and BATES, HICKS & FOLONIE, for appellant; ROBERT J. FOLONIE and ARTHUR A. BASSE, of counsel.

CHARLES C. SPENCER and ARTHUR A. HOUSE, for appellee; LANNEN & HICKEY, of counsel.

MR. JUSTICE MORRILL delivered the opinion of the court.

The Hydrox Company, appellant herein and hereinafter called the defendant, was held liable in this action, which was brought by appellee, hereinafter

called the plaintiff, to recover damages for the death of her husband alleged to have been caused by the violation of the Occupational Diseases Act (Cahill's Ill. St. ch. 48, ¶ 185 *et seq.*). The declaration contains but one count and alleged, in substance, that the defendant was an employer of labor and engaged in carrying on work which might produce illness or disease peculiar thereto, and which subjected and exposed its employees to the danger of illness and disease incident to such work or process to which employees are not ordinarily exposed in other lines of employment; that the specific work in which decedent was engaged was that of painting divers coolers and receptacles, stands and other things used and employed by defendant in and about its business; that the decedent was engaged in painting such articles and was required in the course of said employment to be around and about paint and lead and come into direct contact with poisonous agencies and injurious processes and was exposed to poisonous and injurious dusts, fumes and gases under harmful conditions, and in such a manner as was likely to produce illness and disease peculiar to the work to which employees are not ordinarily exposed in other lines of employment, specifying lead poisoning and like diseases; that the defendant negligently and wilfully failed to adopt or provide reasonable and approved devices, means or methods for the prevention of such occupational diseases as were incident to the work, and wilfully violated and failed to comply with the provisions of the statute in question; that defendant failed or neglected to provide or place at the disposal of its employees protective devices and measures of the general character specified in the second and other sections of the act, and that by reason of these violations of the act the decedent was affected and seized with lead poisoning, which is alleged to be an occupational disease incident to the work in question. A plea

of the general issue was filed. There was a trial before a court and jury and a verdict of guilty, assessing the plaintiff's damages at the sum of $5,000. Judgment was entered upon this verdict, a reversal of which is now sought.

The decedent, Frank Dandurand, had been working for the defendant, or its predecessor in business, since 1914. He left the employ of defendant in April, 1916, and worked elsewhere as a carpenter for a few days during that month, but became incapacitated by illness in the latter part of that month and died on May 1, 1916. While he was in the employ of defendant he seems to have been a general utility man, working as a tinsmith, as a carpenter and as a painter, his principal occupation being the repainting of water coolers with an air brush or painting machine. The business of the defendant was manufacturing and selling ice and ice cream, also selling drinking water. In connection with this business defendant used certain water coolers or receptacles for drinking water which were delivered to its customers and used by them to hold ice and drinking water sold to them by defendant. As these coolers from time to time became marred or disfigured by use, thereby losing their fresh appearance, they were taken to defendant's paint shop located on the fourth or top floor of its building and repainted by the use of the painting machine above mentioned. The decedent had charge of this work and personally mixed the paint and used the machine. Plaintiff claims that her decedent in doing this work became affected with the disease of lead poisoning, or plumbism, by which is meant poisoning by the introduction into the body of some preparation of lead; that lead poisoning is an occupational disease incidental to the work of a painter; and that defendant is liable for damages on account of the death of decedent from the lead poisoning so acquired by reason of its failure to comply with the provisions of the Occupational Diseases Act before mentioned.

The act in question went into effect on July 1, 1911. The declaration charges the violation of section 1 thereof (Cahill's Ill. St. ch. 48, ¶ 185), which is as follows:

"That every employer of labor in this State engaged in carrying on any work or process which may produce any illness or disease peculiar to the work or process carried on, or which subjects the employees to the danger of illness or disease incident to such work or process, to which employees are not ordinarily exposed in other lines of employment, shall, for the protection of all employees engaged in such work or process, *adopt and provide reasonable and approved devices, means or methods for the prevention of such industrial or occupational diseases as are incident to such work or process.*"

The provisions of other sections of the act are also involved in the consideration of the case. Section 2 (Cahill's Ill. St. ch. 48, ¶ 186) relates to certain lines of industry which are declared to be especially dangerous to health, being those which require the using and handling of a variety of lead preparations, the manufacture of brass and the smelting of lead or zinc. In these industries the act requires that employers shall provide and maintain for the benefit of their employees proper working clothing to be used while such employees are at work, and that all employees be required to use and wear such clothing, and that in all processes mentioned in the section which are unnecessarily productive of noxious or poisonous dusts, adequate and approved respirators shall be furnished by the employer and used by the employees. Section 3 of the Act (Cahill's Ill. St. ch. 48, ¶ 187), provides that in case of employment described in section 2, employees shall be examined monthly by a competent, licensed physician. Other sections of the act provide that lavatories shall be provided having adequate facilities for cleansing the bodies of the employees and dressing rooms shall be provided so that the ordinary

street clothes of the employees shall be kept separate and apart from their working clothes. The act also provides that devices shall be furnished for carrying off injurious fumes and for the cleansing of flues, washing floors and the furnishing of separate rooms for dangerous processes, the covering of hoppers and chutes and the posting of notices containing the salient features of the act and warning against known dangers from occupation.

One of the principal grounds for reversal urged on behalf of the defendant is that the plaintiff's declaration does not allege any occupation or business under section 2 of the act and that for this reason the various provisions of that section, as well as other protective provisions of the act which are claimed to have been violated, are not applicable to the case at bar upon the ground that they are by the act itself specifically made applicable only in cases arising under section 2, and appellant also contends that its only duty under section 1 was to "provide reasonable and approved devices, means or methods for the prevention of occupational diseases incident to the work, in cases where employees are not exposed to such dangers ordinarily in other lines of employment."

It will be noted that section 1 of the act is general in its terms and requires only that employers shall adopt and provide reasonable and approved devices, means or methods for the prevention of industrial or occupational diseases incident to the work in which they are engaged and does not indicate the nature of the devices, means or methods which are to be adopted, while other sections of the act to which reference is made specify the conditions which must be observed by employers in order to comply fully with the act. Section 2 indicates some of these protective measures and other sections to which reference is above made indicate further and additional precautions which are to be observed. It is true that plaintiff's declaration,

in addition to its charge of a violation of section 1 of the act, also charges that the defendant failed to observe certain precautionary methods, including not only some of those specified in section 2, but also those which are mentioned in other sections of the act. A considerable portion of appellant's brief is devoted to this aspect of the case upon the theory that the plaintiff has charged a violation of section 1 but has undertaken to prove a violation of section 2. We do not find such to be the case and are of the opinion that the plaintiff was justified in asserting and proving, or attempting to prove, the failure of the defendant to observe the protective measures or use the devices mentioned in various sections of the act under the theory that all such devices, means or methods are fairly included within the category of "reasonable and approved devices, means or methods for the prevention of such industrial or occupational diseases" incidental to the work in question as specified in section 1 of the act. If the statement of plaintiff's cause of action contained in her declaration was defective or inaccurate, we are of the opinion that all such defects and inaccuracies, to which our attention has been called, were cured by the verdict. (*Gerke v. Fancher,* 158 Ill. 375.)

It is also urged on behalf of appellant that the plaintiff's remedy, if any, was under the Compensation Act and cites in support of that theory the case of *Matthiessen & Hegeler Zinc Co. v. Industrial Board,* 284 Ill. 378, in which it was held that compensation might be recovered under the Workmen's Compensation Act as for accidental injury in a case of death from arsenical poisoning where it was not established by the evidence that the death was due to an occupational disease. In that case the evidence showed that during 50 years of active operation of the plant no case of lead or arsenical poisoning had ever been known. We believe that this brief statement of the facts involved

in the case cited is sufficient to show that it is not applicable to the case at bar. It seems to be admitted that the decedent in this case died from lead poisoning. Whether or not lead poisoning is an occupational disease incidental to the work of a painter was a question for the jury to determine. In the case of *Wilcox v. International Harvester Co.*, 198 Ill. App. 33 [14 N. C. C. A. 728], it was held that lead poisoning was an occupational disease incident or peculiar to the work of a compositor. This holding was based upon the testimony of witnesses showing the prevalence of lead poisoning in the printing trade. The record in this case shows that the plaintiff offered and attempted to prove numerous cases of lead poisoning arising in connection with the work of a painter. There was also an attempt to prove the same proposition by expert testimony. Objection was made by the defendant to the admission of evidence of this character and the objection sustained. We are not called upon to make any decision as to the correctness of the rulings of the trial judge in this particular, but it may be observed that defendant ought not to be heard to object that a fact has not been proved where the proof has been prevented by its objections. *Hahl v. Brooks*, 213 Ill. 134; *Jobbins v. Gray*, 34 Ill. App. 208.

It is also urged by appellant that there was reversible error in sundry instructions given and refused by the court. The given instructions to which appellant objects may be stated generally to be those which embody in their terms the provisions of sections 1, 2, 3, 6, 13 and 15 of the act in question, and instruct the jury that a failure on the part of defendant to comply with these provisions of the act would constitute a wilful violation of the act and a wilful failure to comply with its provisions in the sense that the word "wilful" is used in the act. We believe that these instructions were proper and that no error was com-

mitted by the court in giving them or in refusing to give other instructions which were asked.

It remains only to determine whether or not the evidence in the case was sufficient to justify the ver- .dict of the jury. We shall not attempt to review the evidence in great detail and shall confine ourselves only to a statement of certain salient features in addition to those which have already been set forth. The principal complaint is based upon the work which decedent did in connection with the use of the air brush or painting machine above mentioned. Before the commencement of the process of painting, the water cooler was placed in a cylindrical metal cabinet, in which it rested on a support which revolved on ball bearings carrying the cooler with it. The cooler was sprayed with paint, which was conveyed from the receptacle containing the paint, through a hose and nozzle operated by hand. This cabinet extended up through the roof by means of a funnel which had an exhaust fan attached for the purpose of sucking out any vapors that might arise. This exhaust fan is is shown to have been out of commission and use for considerable periods of time during the course of the employment in question. The cabinet was entirely closed, except the door through which the spraying was done. The size of the aperture is said to have been sufficient to allow the water cooler to be placed in it, and in another instance it was stated to have been about 4 feet square. The decedent operated this machine personally and in doing so his face was 2 or 3 feet distant from the spray itself. He never wore any protection over his face or mouth when he was operating the machine. A witness who testified that he was in the paint room at least twice each day stated that the fumes from the spraying machine could be smelt and the spray could be seen as the paint went over the coolers. The coolers which were sent to the shop for repainting were washed, scraped and sand-

papered before the paint was put on. The lead paint scraped from the coolers fell to the floor and was swept up daily by the decedent. The floors were not moistened when the sweeping process was carried on. Decedent mixed all paint that was used in the shop. It is not disputed that a preparation of lead is one of the ingredients.

This work was conducted upon the top floor of a 4-story building, which was divided into rooms used for repairing, painting, printing and laundry purposes. Apparently the painting room was located between the other departments and separated from them by partitions. It is not clearly shown from the evidence just how many outside windows were located in the painting room. It is stated by one of the witnesses that there were some outside windows and a glass skylight, which could be opened for ventilation purposes in case the state of the weather permitted. It is also shown by the evidence that there was no lavatory on the fourth floor of the building other than the sink in which the defaced coolers were placed to soak and were scraped before being subjected to the painting process; that there was no place upon this floor for employees to change or keep their clothing and no working clothes provided for employees as required by the act, although this is disputed by appellant; that there was no dressing room near the premises and that the employees were not examined by any physician for any purpose whatever. The appliances for enabling the employees to cleanse their persons after finishing their day's work, such as they were, were not adjacent to the paint shop or conveniently accessible. They were located principally in another building separate and distinct from the building in which the paint shop was located.

There is no dispute but that the decedent died from the effects of lead poisoning, but appellant alleges that the disease was acquired long before decedent

entered its employ, and that the nature of the disease is such that it cannot develop so as to become fatal within so short a time as the period of his employment. This contention is based upon the testimony of a medical expert called on behalf of the defendant, who stated that he had never known a case of progressive lead poisoning to have developed so as to cause death within less than 5 years. The decedent was examined by Dr. Thompson in April, 1916. The death occurred on May 1, 1916. Dr. Thompson describes at length the symptoms of the patient and made a diagnosis of lead poisoning. He stated that he could not tell how long the patient had been suffering from this disease and that the disease may reach a fatal state very rapidly within a period of several weeks or that it may extend over a period of years. The medical expert called by the defendant gave it as his opinion that death would not result from this disease in the course of 3 or 4 years, although he admitted that such a result might be possible, and that he had never known of such a case. The evidence shows that the decedent had been engaged in this work for over 3½ years, the exact duration of such employment not being given by any witness. The general conclusion which must be derived from the medical testimony is that it was not impossible for the decedent to have acquired the disease during the period that he was engaged in the work above indicated. Medicine is not an exact science like mathematics. Conclusions and deductions must always be subject to the qualifications, limitations and conditions imposed by individual cases. The mere fact that one of the medical witnesses stated that in his experience he had never known a case to develop to a fatal state in less than 5 years is not conclusive evidence that the disease did not develop in the case here involved within a shorter period. The witness himself recognized the possibility that this might have occurred and also rec-

ognized the necessity of qualifying the application of general rules to individual cases when he stated that it all depends on conditions and environments and that there is a great difference in individuals "as to how much lead they can stand." Exceptions often prove the general rule.

One of the fundamental questions in the case is the determination whether or not lead poisoning is an occupational disease incident or peculiar to the work of a painter. We are not furnished with any citation of authorities upon this question, but have been referred by counsel for appellant to the case of *Wilcox v. International Harvester Co.*, 198 Ill. App. 33 [14 N. C. C. A. 728], which has already been discussed. The trial court was correct in holding that this question was one to be determined by the jury. A careful examination of the evidence leads us to believe that lead poisoning is incidental to the work of a painter; that the decedent died as a result of this disease; that the disease was contracted while he was in the employ of defendant because of the wilful violation of the provisions of the Occupational Diseases Act for the protection of persons employed in work which may produce illness or disease peculiar to the work in which the employee was subject to a danger of illness or disease incidental to the work to which employees are not ordinarily exposed in other lines of employment. In other words, we are of the opinion that the evidence in this case was sufficient to sustain the verdict of the jury and the judgment of the superior court.

There being no reversible error in the instructions given or refused by the court, the verdict of the jury cannot be disturbed.

The judgment of the superior court is affirmed.

*Affirmed.*

GRIDLEY, P. J., concurs.

MR. JUSTICE BARNES *dubitante:* I have grave doubt whether the facts of this case bring it within the scope of the act. Seemingly the employment in which deceased was engaged cannot be distinguished from the ordinary work of shop painting except in the method employed which is apparently not peculiar to defendant's business.